USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/4/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
UNITED STATES OF AMERICA :
: 17 Cr. 182 (KBF)
- v. - :
: OPINION & ORDER
ADAN MATOS, :
:
Defendant. :
:
------------------------------------------------------------------X

KATHERINE B. FORREST, United States District Judge:

On December 16, 2016, Adan Matos was arrested for possessing a weapon and drugs and charged in state court. On December 19, 2016, a two-count complaint was filed in this district charging the defendant with possession of a defaced firearm in violation of 18 U.S.C. § 922(k), and with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (ECF No. 1.) Before the Court is defendant's Motion to Suppress the drugs and weapons that he asserts were seized in violation of his rights under the Fourth Amendment as well as statements he made to the police at the time of his arrest. Defendant also seeks disclosure of evidence of uncharged crimes pursuant to Federal Rule of Evidence 404(b) as well as Brady and Giglio material.

Because there were contested issues of fact—in particular, whether the officers had probable cause or reasonable suspicion to stop defendant and seize his gun—the Court held an evidentiary hearing on November 3, 2017.

For the reasons set forth below, the Court DENIES the motion.

I. FACTS[1]

Officers Gabrielle Rodriguez and Kenny Maldonado testified at the November 3, 2017 hearing, as did Detective Carlos Merchena. The Court found each of the three witnesses credible and relies on their testimony.[2]

On the night of December 16, 2016, Officer Rodriguez and her supervisor, Sergeant Fana, were assigned to the anticrime unit of the 41st precinct in the Bronx and were on their nightly patrol. (Hearing Transcript "Tr.," at 15.) They drove an unmarked vehicle and dressed in plain clothes. (Id. at 15–16.) At around 11:00 P.M., Rodriguez was driving north on Garrison Avenue towards Manida Street; Fana was seated in the passenger seat. (Id. at 16.) As they approached Manida Street, Rodriguez noticed the defendant, who was facing the vehicle and walking southwards on Garrison Avenue. (Id.) She observed defendant step into the crosswalk on Manida Street, meet two men who were coming from the opposite direction, remove something from his right jacket pocket, and hand it to one of the two individuals. (Id. at 16–17.) She further observed the individual hand the defendant money, which defendant put into his pants pocket. (Id.) Rodriguez was unable to see what defendant had removed from his chest pocket, but based upon her training and experience, she believed the transaction to be a drug sale. (Id. at 17–18.) She testified that she had seen at least 30 to 40 hand-to-hand drug

---

[1] The Court makes its findings of facts upon a preponderance of evidence.

[2] In his post-hearing memorandum ("Def.'s Post-Hearing Mem."), ECF No. 38, defendant argues that the Government, by virtue of its choice not to call Sergeant Fana to testify, failed to satisfy its burden of proof. This argument is unpersuasive. The Government called three eyewitnesses to satisfy its burden. The defendant was free to subpoena Sgt. Fana, if he felt that his testimony or credibility would be helpful.

transfers while working as a police officer and had participated in hundreds of arrests, mostly drug related. (Id. at 12, 19.) Rodriguez further testified that in her experience, the area where the arrest occurred is "high in crime and drug sales." (Id. at 14.)

Upon observing what she believed to be a drug sale, Rodriguez told Fana that "[h]e hit him off." (Id. at 22.) She used this phrase to convey to Fana that she had just witnessed a drug transaction. At this point, defendant turned back in the direction from which he had come and began to walk away. (Id.) As he was walking away, defendant turned around, made eye contact with Rodriguez, and adjusted something in his waistband. (Id. at 23.)

Sergeant Fana exited the car and Rodriguez pulled the car further ahead, pulling in diagonally near the front of 1008 Garrison Avenue. (Id. at 23–26.) Rodriguez testified that the area in front of the building was well-lit, and that as she got out, she saw that defendant had keys in his hand.[3] (Id. at 26, 37–38.) As she and Fana approached defendant from behind, Rodriguez observed defendant put his hand towards his waistband in the same area that he had previously. (Id. at 28.) Rodriguez was able to smell marijuana as she approached defendant. (Id. at 29.) Rodriguez testified that when she saw the defendant reach into his waistband, she became concerned for her safety and assisted Fana in pushing defendant up against a railing in front of 1008 Garrison Avenue. (Id. at 28–29, 35.) She further

---

[3] The defendant stresses that he held keys in his hand at the time of his stop, and that this provides a better explanation of what Rodriguez saw when she saw defendant adjusting his waistband. The Court disagrees and credits Rodriguez's testimony that as she approached defendant from behind, and saw him adjust his waistband, she feared for her own safety.

3

testified that Fana then immediately reached over and removed a gun from the defendant's waistband, in the same spot in which she had previously seen the defendant twice reach; she heard the defendant state "you got it;" she then handcuffed defendant. (Id. at 28–29.) Rodriguez heard defendant state, upon arrest, "It was just weed." (Id. at 51.)

After defendant was handcuffed, Rodriguez testified that Fana radioed for an additional unit. (Id. at 31.) Officer Maldonado, another anticrime officer in the 41st precinct with 11 years of experience on the N.Y.P.D., was assigned to an intelligence unit that night. (Id. at 145–146.) At the time of defendant's arrest, he and his supervisor, Lieutenant Myers, were located on the corner of Hunt's Point Avenue and Seneca Avenue, about one block from 1008 Garrison Avenue. (Id. at 147; GX 1.) Maldonado testified that he and Myers responded to Fana's call and went to meet Fana at the corner of Garrison Ave. and Manida St. (Id. at 147–48.) When Maldonado arrived at the scene, he saw defendant and was told by Fana to "canvas for two male Hispanics in regard to a transaction that had happened." (Id. at 149.) Maldonado and Myers proceed to search for the two individuals, but were unable to find them. (Id. at 149–50.)

Defendant was subsequently transported to the precinct. (Id. at 38.) Once there, Rodriguez conducted a full search of defendant and recovered 26 bags of marijuana, one bag of ecstasy pills, and one bag of Xanax pills, all from defendant's right chest pocket. (Id. at 38–41; GXs 7, 10.) This was consistent with her testimony that she had seen him remove something from the same pocket in the

4

course of the alleged drug transaction. She recovered one bag of crack cocaine from his pants pocket. (Id. at 41; GXs 7, 10.) She also recovered two cell phones, and $313, $10 of which was in defendant's right jean's pocket.[4] (Id. at 39, 42; GXs 7, 9, 11.) This was consistent with Rodriguez's testimony that she saw defendant place money into his pants pocket. Finally, she recovered some keys on a ring and an electric key. (Id. at 43–44.) Rodriguez gave the gun that Fana had taken to ECT (the Evidence Collection Team) to process. (Id. at 44.) Once ECT had processed the gun, they returned it to Rodriguez to voucher. (Id.) Her testimony is that the gun was a Jimenez Arms firearm that was loaded.[5] (Id. at 44–45.) She filled out the appropriate paperwork and then returned to the scene of the arrest to look for possible video footage of the intersection where the drug transaction occurred and the front of 1008 Garrison Avenue. (Id. at 45–50.) She testified that she was unable to find any.[6] (Id. at 50.)

---

[4] The defendant says that Rodriguez's credibility is hurt by the fact that she said at the hearing that all $10 was defendant's jean pocket, while the remainder of the money was elsewhere, where before she said in the Federal Complaint that all $313 was found together in the jeans. However, since Rodriguez was generally credible, this detail fails to undermine her testimony.

[5] Rodriguez was unsure of the exact number of bullets in the gun, but estimated it to be around seven.

[6] Defense counsel offered into evidence photographs showing multiple video cameras in the vicinity. Upon cross-examination, it was Rodriguez's testimony: 1) that she had no knowledge as to whether those cameras were there on December 16, 2016; and 2) that she was focused only on obtaining footage of the alleged drug transaction in the intersection and so did not consider many of the alternate locations of which defense counsel produced photographs. Though there does not appear to have been a serious search for video footage, the Court did not conclude that Rodriguez was untruthful.

II. LEGAL PRINCIPLES

A. Burden of Proof

The burden of production and persuasion generally rest upon the movant in a suppression hearing. United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). "The movant can shift the burden of persuasion to the Government and require it to justify its search, however, when the search [is] conducted without a warrant." Id. At a suppression hearing, the burden must be met by "no greater burden than proof by a preponderance of the evidence." United States v. Matlock, 415 U.S. 164, 177 n.14 (1974).

B. Exclusionary Rule

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. Davis v. United States, 564 U.S. 229, 236 (2011). If a court concludes that a search or seizure violated the Fourth Amendment, it must determine whether to suppress the evidence obtained as a result of that illegal search or seizure. See Mapp v. Ohio, 367 U.S. 643 (1961).

The exclusionary rule is a "deterrent sanction," Davis, 564 U.S. at 231–32, and "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)). Because the exclusionary rule is a "prudential" doctrine, see Davis, 564 U.S. at 236, it is

6

"applicable only . . . where its deterrence benefits outweigh its substantial social costs," as "suppression of evidence . . . has always been our last resort, not our first impulse." Strieff, 136 S. Ct. at 2061 (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).

C. Probable Cause to Arrest

If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). Probable cause exists if "the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990). As the Supreme Court has noted, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). An officer is "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Martinez v. Simonetti, 202 F.3d 625, 635–36 (2d Cir. 2000).

Courts in this circuit routinely find probable cause to arrest when an officer believes, based on his or her experience, that an individual is engaged in a hand-to-hand drug sale. See, e.g., Morales v. Greiner, 381 F.3d 47, 47–48 (2d Cir. 2004) (holding that where defendant "was arrested in a location known to have significant

7

narcotics activity" and an undercover detective observed [defendant] engaging in hand-to-hand sales that there was probable cause for arrest); United States v. Vasquez, 297 F. Supp. 2d 696, 698 (S.D.N.Y. 2004) (finding probable cause to arrest where "a police officer conducting surveillance in a location known for drug sales" observed defendant twice hand an object from his car to another person in exchange for money); United States v. Washington, No. 2-cr-1574, 2003 WL 21250681, at *2–3 (S.D.N.Y. May 29, 2003) (finding probable cause to arrest where officers observed a hand-to-hand transaction in a high-crime area, and later recovered drugs on the defendant). See also Mohr v. City of New York, No. 12-cv-163, 2013 WL 5988948, at *5 (S.D.N.Y. Nov. 12, 2013) (finding no probable cause to arrest where the officer did not observe objects or cash exchanged between subjects, and distinguishing the facts in that case from other scenarios in which cash was exchanged, in which there was probable cause).

D. Terry Stop and Frisk

The "ultimate measure" of the constitutionality of a governmental search or seizure is its "reasonableness." United States v. Bailey, 743 F.3d 322, 331 (2014) (citing Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995)). Generally, "reasonableness" requires a particularized judicial warrant based on probable cause prior to a search or seizure. Bailey, 743 F.3d at 331. However, in Terry v. Ohio, the Supreme Court held that in certain circumstances, "reasonableness" allows a police officer to temporarily detain a person for questioning without a warrant. 392 U.S. 22–25 (1968).

8

A <u>Terry</u> stop of a person or vehicle must be justified by a "reasonable suspicion" to believe that the individual is "engaged in illegal activity." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002). A reasonable suspicion requires more than a mere "hunch;" rather, it demands "specific and articulable facts" and a "particularized and objective basis" to suspect illegal conduct. <u>Terry</u>, 392 U.S. at 21, 27; <u>Arvizu</u>, 534 U.S. at 273. Officers may still draw upon their "own experience[s] and specialized training to make inferences from and deductions about the cumulative information available to them." <u>Arvizu</u>, 534 U.S. at 273.

A reviewing court will look at the "totality of the circumstances" when determining whether there was a reasonable suspicion to support a <u>Terry</u> stop. <u>Bailey</u>, 743 F.3d at 333. The standard for a reasonable suspicion is "not high." <u>See</u> <u>Richards v. Wisconsin</u>, 520 U.S. 385, 394 (1997) (citing <u>Terry</u>, 392 U.S. at 30, and describing the standard for reasonable suspicion in the context of a no-knock search). It is "less demanding than probable cause," and only requires sufficient facts to reasonably suspect that criminal activity "'<u>may</u> be afoot.'" <u>United States v. Singletary</u>, 798 F.3d 55, 60 (2d Cir. 2015) (quoting <u>Terry</u>, 392 U.S. at 30) (emphasis in original). Furthermore, the Constitution "does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of circumstances supporting a reasonable basis to believe that criminal activity may be afoot." <u>Singletary</u>, 798 F.3d at 61.

"There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops. A law enforcement agent, faced

9

with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether or not probable cause exists." United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990) (internal citations omitted). On the other hand, when law enforcement officers exceed the bounds of permissible safeguards and thereby convert an otherwise legitimate investigative stop into a de facto arrest, probable cause is required. Id. at 272–73. Thus, even if articulable suspicion supports an investigatory stop and pat-down, the Fourth Amendment demands that the scope and duration of the detention be reasonable. Bailey, 743 F.3d at 336 (finding that a detention of less than ten minutes did not exceed constitutional limits under the circumstances).

An officer may frisk an individual whom he believes to be armed and presently dangerous. Terry, 392 U.S. at 30. Terry frisks must meet two requirements. First, they cannot be motivated "solely by a 'hunch' that an individual is armed and dangerous." United States v. Casado, 303 F.3d 440, 444 (2d Cir. 2002) (quoting Terry, 392 U.S. at 27.) Second, the "weapons search must be 'confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.'" Id. (quoting Terry, 392 U.S. at 29.)

While "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized suspicion that the person is committing a crime . . . officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Illinois v. Wardlow, 528

10

U.S. 119, 124 (2000).  Courts in the Second Circuit have often found one relevant factor in developing reasonable suspicion is whether an area is known by officers to be a high-crime area.  See, e.g., United States v. Williams, 536 Fed. App'x 29, 32 (2d Cir. 2013) (finding reasonable suspicion in part because an officer observed the defendant engaged in unusual behavior at night in a high-crime area).

Furthermore, the fact that a defendant grabs at his waistband can also give rise to reasonable suspicion.  See, e.g., United States v. Vashja, 282 Fed. App'x 942, 944 (2d Cir. 2008) (using the facts that the defendant was grabbing his waistband and walking away quickly from the police car as factors in establishing reasonable suspicion).

Another relevant factor under the totality of the circumstances test is the fact that an officer views a hand-to-hand transaction for money.  See United States v. Hemingway, 5-cr-6108, 2007 WL 2245896, at *8 n.8 (W.D.N.Y. Aug. 1, 2007).  As noted above, the observation of a hand-to-hand transaction can also give rise to probable cause.  See, e.g., Morales, 381 F.3d at 47–48; Mohr, 2013 WL 5988948, at *5; Vasquez, 297 F. Supp. 2d at 698; Washington, 2003 WL 21250681, at *2–3.

III.  DISCUSSION

Defendant makes two assertions: 1) that he was stopped and searched by the police without reasonable suspicion or probable cause; and 2) that, even if there was reasonable suspicion to stop and search him, the stop ripened into an arrest when he was grabbed by the officers.  As such, defendant argues that all evidence recovered

11

and statements made as a result of the allegedly unconstitutional stop and arrest should be suppressed.[7]

For its part, the Government argues that it had reasonable suspicion to stop and frisk the defendant. It argues further that not only did it possess reasonable suspicion, but had probable cause at the outset (having witnessed a drug transaction) to arrest defendant.[8]

### A. Reasonable Suspicion to Stop and Frisk

Viewed as a whole, the circumstances of this case support the assertion that Officer Rodriguez had a suspicion that "criminal activity may be afoot." United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001) (internal quotation marks omitted).[9] Officer Rodriguez observed defendant remove something from his jacket pocket and exchange it, on the street, for money in a high-crime neighborhood, in which she knew drug transactions regularly to occur. (Tr. at 16–18.) She further saw defendant grab twice at his waistband, and move away from her vehicle. (Id. at 22–23.) As discussed above, grabbing at a waistband and presence in a high-crime area at night are factors that have been used to develop reasonable suspicion. See Williams, 536 Fed. App'x at 32; Vashja, 282 Fed. App'x at 944. More importantly,

---

[7] Separately, he argues for disclosure of evidence of uncharged crimes which the Government may seek to introduce into evidence against him at trial and for disclosure of Brady/Giglio materials.

[8] The Government further argues that early disclosure of 404(b) evidence and Brady and Giglio material are unnecessary and that it intends to comply with those obligations at the appropriate time.

[9] Defendant argues that the Court should apply New York state law to determine whether the stop and frisk was lawful. Since to do so would not be outcome-determinative, the Court declines defendant's invitation.

12

Rodriguez's observation of a perceived drug transaction crosses the threshold from reasonable suspicion to probable cause. See Morales, 381 F.3d at 47–48 (finding probable cause where defendant "touched hands" with other individuals in an area known for "narcotics activity").

Defendant argues that it is relevant that the two alleged purchasers were not apprehended. (ECF No. 20, Defendant's Memorandum in Support ("Def.'s Mem. Supp.") at 7–8.) However, the Court finds both Rodriguez's and Maldonado's testimony—that instructions were given to canvas for the purchasers, and that the alleged buyers were not located—to be credible. (Tr. 31, 149.) The Court does not find the fact that the alleged buyers were not found to be dispositive as to whether Rodriguez had probable cause to arrest.

As such, the Court finds that defendant's stop was amply supported by probable cause that a drug transaction had taken place. As in Vasquez, 297 F. Supp. 2d at 698, in which probable cause to arrest was based on an officer's observation of defendant sitting in his car in a high-crime area, and exchanging an object from his dashboard for cash, or in Morales, 381 F.3d at 47–48, in which probable cause was found where defendant was seen "touch[ing] hands" with several individuals, and giving them envelopes, so too, Rodriguez's observation of defendant removing something from his jacket pocket and exchanging it for money at night, on the street, in an area known for drug transactions, gives rise to probable cause to arrest. Defendant argues that, unlike in Vasquez, in which the officers observed two transactions that appeared to be narcotics transactions, here Rodriguez observed

13

only one such transaction. This argument is unpersuasive. It takes only a single drug transaction to break the law.

Defendant argues that, even if reasonable suspicion was present, the scope of the stop exceeded <u>Terry</u>'s boundaries. The Court disagrees, for two reasons.

First, as discussed above, the Court finds that there was probable cause to arrest based on Rodriguez's observations that evening. Second, Officer Rodriguez credibly testified that she "was concerned for her safety" when she saw defendant reach for his waistband. (Tr. at 35.) Thus, even if she had not already established probable cause to arrest, the Court would still find that she had a reasonable suspicion that the suspect might "be armed and presently dangerous." <u>Bailey</u>, 743 F.3d at 332. In such circumstances, defendant's momentary detention while the officers removed the gun is permissible under <u>Terry</u>.

B. <u>Discovery Requests</u>

Defendant also demands discovery of routine material, including: 1) all evidence the Government intends to introduce under Fed. R. Evid. 404(b); 2) all exculpatory and impeachment material under <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); and 3) copies of any agreements made pursuant to <u>United States v. Giglio</u>, 405 U.S. 150 (1972). (Def.'s Mem. Supp. at 10–    11.) For the reasons stated below, defendant's discovery demands are hereby DENIED as premature.

To the extent defendant is requesting production of <u>Brady</u> and <u>Giglio</u> materials, the Government has represented that it understands its discovery obligations, and that it intends to comply with such obligations. (ECF No. 22,

14

Government Memorandum of Law in Opposition ("Gov't Mem. Opp.") at 13–14.) The defendant has not proffered any evidence to suggest that the Government is delinquent in fulfilling its obligations, or that the Government is actively concealing evidence under Brady, Giglio, or any other rule. Accordingly, defendant has not provided any basis upon which the Court can grant the requested relief, and there is no need to issue an order directing the Government to comply with its discovery obligations at this time.

To the extent defendant is challenging the timing of the Government's discovery (e.g., by requesting certain evidence immediately), the Court notes that the Government is under no legal obligation to provide the requested material so early. The Court declines to impose on the Government any additional discovery obligations not already contemplated by the applicable rules, absent some showing of delinquency or bad faith. The defendant has proffered no evidence to suggest that the Government will not comply with its discovery obligations in due course. Therefore, defendant's discovery demands are DENIED.

IV. CONCLUSION

For the reasons set forth above, the motion to suppress is DENIED in its entirety. The Clerk of Court is directed to terminate the motion at ECF No 16.

SO ORDERED.

Dated: New York, New York
December 4, 2017

_____
KATHERINE B. FORREST
United States District Judge